**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **FREEMAN JORDAN,** | ) | |
| | ) | |
| Plaintiff, | ) | **No. 20-cv-4450** |
| | ) | |
| v. | ) | **Judge Jeffrey I. Cummings** |
| | ) | |
| **ALEJANDRO MAYORKAS,** | ) | |
| **Secretary, Department of Homeland** | ) | |
| **Security,** | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Freeman Jordan brings this action against the defendant Alejandro Mayorkas, Secretary of the United States Department of Homeland Security, alleging that the Federal Air Marshal Service violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e *et seq* ("Title VII"), by subjecting him to: (1) disparate treatment on the basis of race; (2) retaliation after he raised concerns about discrimination; and (3) a hostile working environment based on his race and retaliatory animus. Defendant has filed a motion for summary judgment, Dckt. #42, which is granted for the reasons stated below.

**I.      LEGAL STANDARD FOR CONSIDERATION OF SUMMARY JUDGMENT**

Summary judgment is appropriate when the moving party shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). "A genuine dispute is present if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might bear on the outcome of the case." *Wayland v. OSF Healthcare Sys.*, 94 F.4th 654, 657 (7th Cir. 2024); *FKFJ, Inc. v. Village of Worth*, 11 F.4th 574, 584 (7th Cir. 2021) (the existence

1

of a factual dispute between the parties will not preclude summary judgment *unless* it is a genuine dispute as to a material fact).

When the moving party has met that burden, the non-moving party cannot rely on mere conclusions and allegations to concoct factual issues. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003). Instead, it must "marshal and present the court with the evidence [it] contends will prove [its] case." *Goodman v. Nat. Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010); *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248. Of course, "It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

In determining whether a genuine issue of material fact exists, all facts and reasonable inferences must be drawn in the light most favorable to the non-moving party. *King v. Hendricks Cnty. Commissioners*, 954 F.3d 981, 984 (7th Cir. 2020). Yet, the nonmovant "is not entitled to the benefit of inferences that are supported only by speculation or conjecture." *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). Ultimately, summary judgment is granted only if "no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (cleaned up).

## II.    FACTUAL RECORD

The Court draws the factual record from the parties' pleadings; defendant's Local Rule 56.1 statement of material facts ("DSOF") (Dckt. #45); defendant's accompanying exhibits

(Dckt. #45-2); plaintiff's Rule 56.1 statement in opposition to DSOF ("DSOF Resp.") (Dckt. #50-1); plaintiff's Rule 56.1 statement of additional facts ("PSOF") (Dckt. #50-2); plaintiff's accompanying exhibits (Dckt. #51-1 through #51-14); and defendant's response to PSOF ("PSOF Resp.") (Dckt. #53). The pertinent facts, construed in the light most favorable to plaintiff, are as follows.[1]

The Federal Air Marshal Service ("FAMS") is a federal law enforcement service within the Transportation Security Administration ("TSA") of the U.S. Department of Homeland Security. *See* Dckt. #12 ¶¶2, 4; DSOF Resp. ¶1. Plaintiff Freeman Jordan ("Jordan") is an African American man who was employed by FAMS from 2001 through 2018. DSOF Resp. ¶1. From 2015 to 2018, he served as an assistant supervisory agent in charge ("ASAC") in the Chicago Field Office. DSOF Resp. ¶1. In his role as an ASAC, Jordan reported to the supervisory agent in charge of the Chicago Field Office ("Chicago SAC"). DSOF Resp. ¶1. David Kohl served as the Chicago SAC from 2015 until October 2018, when Kohl was promoted to the Director of FAMS. DSOF Resp. ¶¶1, 66. Kohl, like most FAMS employees in the Chicago Field Office, was white and Jordan was the only African American ASAC in the office. PSOF ¶53.

Jordan complains of actions dating back to 2016. It was in 2016 that Kohl asked Jordan to limit his emails to regular business hours rather than after hours. DSOF Resp. ¶8. Also in 2016, Kohl told Jordan in an evaluation that Jordan was not yet ready to serve in a leadership

---

[1] The Court notes that it is entitled to strict compliance with Local Rule 56.1 procedures. *See Curtis* v. *Costco Wholesale Corp.*, 807 F.3d 215, 218–19 (7th Cir. 2015); *Stevo* v. *Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011). Accordingly, what follows are the relevant and properly supported factual assertions, based on the undisputed facts as admitted by the parties or, if an objection to an asserted fact was raised, based on the Court's review of the underlying evidence cited in support of or opposition to the fact. *See Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011).

capacity in a field office as large as Chicago but might be better suited for a smaller office. DSOF Resp. ¶7. In 2017, Jordan applied to work as the SAC in Detroit (which was a smaller office than Chicago). DSOF Resp. ¶9. When Jordan was selected for an interview for the Detroit job, he asked to speak with Kohl in preparation for the interview. *Id.* Kohl declined because he would be on the interview panel, *id.*, and indeed he was "the lead panel member for the interview," PSOF Resp. ¶49. The panel asked the candidates the same questions and scored the candidates on multiple factors. *Id.* On a five-point scale with five (5) as the highest mark, Kohl gave Jordan the following scores on the various criterion: a "3" for accountability; a "1" for decisiveness; a "3" for flexibility; a "2" for multitasking; and a "3" for operations management. PSOF Resp. ¶50; Dckt. #51-7 at 2. Thus, the sum of Kohl's scores was 12. Dckt. #51-7 at 2. The sum of Interviewer B's scores was 13, the sum of Interviewer C's scores was 14, and the consensus reached by the three interviewers was 13. *Id.* Jordan was not selected for the job; instead, Richard Altomare, an ASAC in Houston, performed better during the interview process than Jordan and was selected for the SAC position. DSOF Resp. ¶11.

In August 2017, eight days after his interview, Jordan expressed concern to Kohl that Roberta Vickerman ("Vickerman"), a marshal who occasionally reported to Jordan, was undermining Jordan's authority by going straight to Kohl with issues. DSOF Resp. ¶¶12, 32. Kohl then communicated his concerns to Jordan about Jordan's own undermining of Kohl, for example, by sending a scheduling survey despite Kohl's instructions otherwise. DSOF Resp. ¶13. Jordan and several of his colleagues perceived exchanges between Kohl and Vickerman as sexually inappropriate and assumed Kohl favored Vickerman over other employees. PSOF Resp. ¶¶5, 7. For example, in 2017, Kohl backed Vickerman in a dispute about vehicle assignments when the application of office tradition would have resulted in the better car going

to Javier Burgos ("Burgos"). PSOF Resp. ¶¶18–21. Colleagues also corroborate Jordan's

perception that Kohl and Vickerman made fun of Jordan and his work. DSOF Resp. ¶12.

When acting in ways that Jordan and others perceived as demeaning towards Jordan, Kohl did

not use racial language. PSOF Resp. ¶16.

In October 2017, Kohl promoted Vickerman to the position of Assistant Federal

Security Director for Law Enforcement ("AFSD-LE"). DSOF Resp. ¶18. AFSD-LEs report to

an ASAC but often go directly to the SAC. DSOF Resp. ¶2. Jordan believed that Kohl

recommended Vickerman for promotion over more qualified men. DSOF Resp. ¶18. In March

2018, Kohl shared a list of candidates for an open Chicago ASAC position with Jordan and he

ultimately recommended a candidate for the position who was not preferred by Jordan. DSOF

Resp. ¶14. In April 2018, Kohl omitted Jordan from emails and meetings that Jordan believed he

should have been privy to. DSOF Resp. ¶23. A colleague testified that on occasion Kohl had cut

off Jordan in meetings and ignored issues Jordan raised. PSOF Resp. ¶10.

In April 2018 Jordan initiated contact with the applicable Equal Employment

Opportunity ("EEO") office for the first time. *See* Dckt. #44 at 10–11. On June 12, 2018,

Jordan submitted an EEO complaint about Kohl's behavior, which he later supplemented on a

few occasions. PSOF Resp. ¶¶56–57; Dckt. #45-2 at 27; Dckt. #45-2 at 434. In addition,

Jordan sent Kohl a June 14, 2018 email complaining of discrimination, harassing behavior,

hostile work environment, and inappropriate actions by Kohl. PSOF Resp. ¶55. Jordan also

confronted Kohl about Kohl's reference to Vickerman and another woman (Connie Frost) with

language – such as "cunt" and "bitch" – that is demeaning towards women. PSOF ¶58.

Tasked with investigating Jordan's EEO complaint, FAMS-designated fact-finders Alex

Smollok and Daniel Babor interviewed Vickerman, whom Jordan referenced in his complaint.

During that interview, Vickerman set forth allegations against *Jordan* of bullying and sexual harassment. . PSOF Resp. ¶30. By September 2018, Smollok and Babor initiated an investigation of these new allegations against Jordan.

Jordan was not notified about this investigation, despite his belief that the agency handbook required management to inform an employee accused of harassment of an investigation. *See* PSOF ¶27.[2] Specifically, FAMS management personnel who knew of the investigation yet did not disclose its existence to Jordan include Kohl, Vickerman, Sterling Keys, and Robert Bond. PSOF Resp. ¶¶28, 29, 32. Conversely, Bond had notified Kohl when Jordan submitted his complaint against Kohl. PSOF ¶¶34–36. Jordan did not receive his scheduled bonuses while under investigation. PSOF Resp. ¶47.[3] Kohl, on the other hand, did receive his scheduled bonuses without delay. PSOF Resp. ¶48. Ultimately, both Jordan's complaints against Kohl and Vickerman's complaints against Jordan were dismissed without action. PSOF Resp. ¶29.

Serving as Acting SAC offers career development opportunities that augment one's promotional potential. PSOF Resp. ¶64. Michael Buchanan (who was hired as an ASAC in the Chicago Field Office in July 2018) and Jordan were assigned to share the role of Acting SAC via thirty-day rotations,[4] and Kohl had been consulted about this appointment. PSOF Resp.

---

[2] Jordan cites to the TSA Handbook to Anti-Harassment Program, Management Directive 1100.73-3, which requires management and human resources to "[i]nform the alleged harasser that an allegation has been made regarding his or her conduct and the nature of the conduct . . . [and] that he or she must immediately discontinue the alleged offending conduct." Dckt. #54 at 9.

[3] Jordan testified that everyone – including himself – who is under an ITR (incident tracking report) cannot get their bonus paid until after the investigation is closed out. Dckt. #45-2 at 115–16.

[4] Jordan surmises that had he not complained about Kohl, Kohl would not have promoted Buchanan, and Jordan would not have had to share the Acting SAC position with Buchanan. *See* PSOF ¶¶60–66.

¶¶60, 64.  Although Jordan had been named Acting SAC on three occasions between 2015 and 2016 and one occasion in 2017, he was not named Acting SAC between June 2017 and April 2018. PSOF Resp. ¶24.  On August 31, 2018, Jordan submitted an affidavit in support of his EEO complaint in which he identified nineteen occasions during which he was not selected to serve as Acting SAC.  Dckt. #45-2 at 439, 455.  However, only three of these occasions occurred within the forty-five days of his EEO contact in April 2018 (namely, from April 23 to 25, 2018; April 13 to 15, 2018; and March 22 to 30, 2018).  Dckt. #45-2 at 439.

In October 2018, Kohl was promoted to the position of FAMS Director and the Chicago SAC position was vacated.  PSOF Resp. ¶62; DSOF Resp. ¶36.  Jordan thereafter applied for the open Chicago SAC position that was vacated by Kohl.  *Id.*  Although he was deemed to be qualified, Jordan was not selected for an interview, and he does not know who determined which candidates would be interviewed.  DSOF Resp. ¶¶36–37.  Kohl, who served at the FAMS headquarters in Washington D.C., had no knowledge related to Jordan's application for Chicago SAC.  DSOF Resp. ¶37.

In December 2018, Jordan filed another EEO complaint that alleged that he was discriminated against based on his race and subject to retaliation between 2016 to 2018 by Kohl, Keys, Bond, and Vickerman.  DSOF Resp. ¶38.

On July 29, 2020, after the conclusion of the EEO administrative process, Jordan filed suit in this Court.  DSOF Resp. ¶38; *see* Dckt. #1.  In his complaint, Jordan alleges that defendant violated Title VII by subjecting him to racial discrimination and retaliation under both disparate treatment and hostile work environment theories.  *Id.*  The parties agree that this lawsuit encompasses the twenty-five instances of discrimination and retaliation that were identified in Jordan's June and December 2018 EEO complaints.  DSOF Resp. ¶38; Dckt. #45-

2 at 27-29, 35-36 (listing the twenty-five instances at issue).

During the course of discovery, Jordan learned from the July 16, 2021 deposition testimony of Burgos (a Field Officer in the FAMS Chicago Field Office) that Burgos heard Kohl refer to Jordan as a "nigger" in the Fall of 2018.  PSOF Resp. ¶22; Dckt. #51-6 at 2. Burgos explained that he did not previously report that Kohl had called Jordan the N-word out of fear that he would be subjected to retaliation and intimidation at the hands of the Chicago Field Office if he reported what he had heard.  PSOF Resp. ¶23.

## III.    ANALYSIS

Defendant asserts that most of Jordan's claims are time-barred and that he otherwise lacks sufficient evidence to raise a genuine issue of fact as to whether FAMS personnel violated Title VII by discriminating against him based on his race, subjecting him to a hostile working environment, or retaliating against him based on his complaints about discrimination.  For the reasons stated below, the Court agrees.

### A.    Jordan's Claims Based on Discrete Events That Occurred Prior to February 14, 2018 Are Time-Barred.

"Federal government employees may bring Title VII . . . employment discrimination claims in federal court only after they have timely exhausted their administrative remedies." *Formella v. Brennan*, 817 F.3d 503, 510 (7th Cir. 2016) (citing 42 U.S.C. § 2000e-16c)).  To fulfill this exhaustion requirement, a federal employee "must obtain EEO counseling or file an informal complaint within 45 days of the alleged discriminatory action."  *Id.* (citing 29 C.F.R. §1614.105(a)(1)).  "[T]he scope of the complaint brought before the administrative agency limits the scope of subsequent civil proceedings in federal court[,]" and "plaintiffs may pursue only those claims that could reasonably be expected to grow out of the administrative charges." *Reynolds v. Tangherlini*, 737 F.3d 1093, 1099–1100 (7th Cir. 2013).  A claim satisfies this

requirement that it be "like or reasonably related to" the administrative charges if it, "at minimum, describe[s] the same conduct and implicate[s] the same individuals." *Hambrick v. Kijakazi*, 79 F.4th 835, 841 (7th Cir. 2023), *quoting Reynolds*, 737 F.3d at 1100; *see also Poullard v. McDonald*, 829 F.3d 844, 855 (7th Cir. 2016) (affirming grant of summary judgment of disparate treatment claim based on untimeliness when "the arguably adverse events [the plaintiff] identifie[d] occurred outside the 45-day window that preceded his contact with the [EEO] counselor").

In this case, Jordan initiated contact with his EEO office on an unspecified date in April 2018. Reading the record in the light most favorable to him, only his complaints about discrete acts of discrimination which occurred after February 14, 2018 (forty-five days prior to April 1, 2018) are timely. To his credit, Jordan "concedes . . . that a timely claim under Title VII requires an employee to first bring a complaint of discrimination to the agency's EEO component within 45 days of the allegedly discriminatory act," (Dckt. #50 at 11), and he affirmatively asserts that he "will not belabor contesting those discriminatory acts that surpassed 45-days from his filing of an informal complaint in April of 2018." (*Id.*, at 12). As such, Jordan has abandoned all claims that are based on events which occurred prior to the forty-five day period.[5] These claims include those based on: (a) Kohl's 2016 performance review comments; (b) FAMS' failure to select him for the Detroit SAC position in 2017; (c) Kohl's 2017 statement that Jordan was biased; (d) the 2017 vehicle swap kerfuffle concerning Vickerman and Burgos; and (4) all but three of the occasions during which Jordan claims he

---

[5] As the Supreme Court has noted, time-barred discriminatory acts may nonetheless "constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977). Discriminatory acts that took place prior to the forty-five-day period could also potentially comprise part of Jordan's hostile environment claim if they are part of the same unlawful employment practice. *See, e.g., Ford v. Marion Cnty. Sheriff's Off.*, 942 F.3d 839, 850–54 (7th Cir. 2019).

was not selected to be the Acting SAC when Kohl was out of the Chicago Field Office.  Dckt. #50 at 11–12.

### B.    Jordan's Disparate Treatment Claims Based on His Race and Retaliation Fail For Multiple Reasons.

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "discriminate against any individual with respect to . . . terms, conditions, or privileges of employment, because of such individual's . . . race." 42 U.S.C. §2000e–2(a)(1); *see Boss*, 816 F.3d at 916, *quoting* 42 U.S.C. §2000e–2(a)(1).  Faced with a motion for summary judgment, the Court "look[s] to see whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race caused the discharge or other adverse employment action." *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023) (cleaned up); *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

To prevail on his disparate treatment claim, Jordan *must* show that he was subject to an adverse employment action.  *West v. Radtke*, 48 F.4th 836, 848 (7th Cir. 2022); *Reives v. Ill. State Police*, 29 F.4th 887, 894 (7th Cir. 2022).  "To be actionable, an employment action must be a significant change in employment status . . . or a decision causing a significant change in benefits." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 980 (7th Cir. 2014) (cleaned up).  Furthermore, "[a]lthough adverse employment actions are often economic injuries, . . . [they] also extend beyond readily quantifiable losses." *Id.* (cleaned up).  Nonetheless, it is equally well-settled that "not everything that makes an employee unhappy is an actionable adverse action because, [o]therwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Reives*, 29 F.4th at 894 (cleaned up); *Lewis v. Wilkie*, 909 F.3d 858, 867–68 (7th Cir. 2018) ("[P]etty slights or minor annoyances that often take place at work" do not suffice).

10

The Seventh Circuit has recognized three general categories of adverse employment actions: "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce further career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Reives*, 29 F.4th at 894 (cleaned up). In the retaliation context, "a materially adverse action need not be one that affects the terms and conditions of employment, but it must be one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." *Lewis*, 909 F.3d at 867 (cleaned up). Nonetheless, "[t]he antiretaliation provision protects an individual not from all retaliation, but [only] from retaliation that produces an injury or harm." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006); *Lewis*, 909 F.3d 867–68 ("Title VII's anti-retaliation provision does not protect an employee against petty slights or minor annoyances that often take place at work and that all employees experience.") (cleaned up).

Jordan relies on the indirect method of proof provided by the *McDonnell Douglas* burden-shifting framework, under which a plaintiff has "the initial burden to establish a prima facie case of discrimination, after which the burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual." *Wince*, 66 F.4th at 1040 (cleaned up). To support a prima facie case, a plaintiff must show that: (1) he is a member of the protected class (or engaged in a protected activity); (2) he met his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class (or who did not engage in protected activity) were treated more favorably. *Id.*; *Lewis*, 909 F.3d at 866; Dckt. #50 at 11.

Jordan asserts that defendant discriminated against him based on his race and in retaliation for his complaints of discrimination by: (1) failing to offer him opportunities to serve as the Acting SAC when Kohl was out of the Chicago Field Office; (2) failing to promptly inform him that he was under investigation for sexual harassment as required by agency policy and depriving him of his bonus while he was under investigation; and (3) subjecting him to a hostile work environment. Dckt. #50 at 13–19.[6]

1. **Jordan's claims based on the failure to offer him opportunities to serve as Acting SAC fails for two reasons.**

As explained above, the vast majority of the occasions during which Jordan asserts that he was wrongfully denied the opportunity to serve as the Acting SAC in the Chicago Field Office when Kohl was out of the office occurred more than forty-five days before Jordan first approached the EEO office in April 2018 and Jordan's claims related to them are time-barred. Jordan presses on and asserts that he was denied the opportunity to serve as the Acting SAC on the remaining three occasions in March and April of 2018 because of his race and/or in retaliation for his complaints of discrimination.

Defendant asserts that Jordan fails to establish a prima facie case as to this claim for two reasons. First, Jordan cannot establish that a similarly situated person outside his protected class was treated more favorably than him (namely, by being named Acting SAC) because *no one* was named Acting SAC on these three occasions. *See Coleman v. Donahoe*, 667 F.3d 835, 846–47

---

[6] During the administrative process, Jordan also complained that he was subjected to discrimination and/or retaliation in October 2018 when defendant's management prevented him from being considered for promotion to Chicago SAC position. Dckt. #45-2 at 36. Defendant addressed this claim in its supporting memorandum and asserted that it was not meritorious for several reasons. Dckt. #44 at 21–22. Jordan, however, did not meaningfully address this claim in his response brief, let alone rebut defendant's rationale for why it should be granted summary judgment on it. *See* Dckt. #50 at 16–17. Consequently, the Court finds that Jordan has abandoned his claim as to the October 2018 promotional opportunity. *See, e.g., Kovaco v. Rockbestos-Surprenant Cable Co.*, 834 F.3d 128, 142–44 (2d Cir. 2016); *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 374 & n.2 (7th Cir. 2020).

(7th Cir. 2012) (summary judgment is appropriate where no reasonable factfinder could find that plaintiff has identified a similarly situated comparator). Second, defendant has offered a legitimate, non-discriminatory reason for why no one – including Jordan – was named as an Acting SAC (namely, because Kohl was available by phone and email) that Jordan has admitted and not shown to be pretextual. DSOF Resp. ¶17.[7]

### 2. Jordan's claim based on the failure to promptly notify him that he was under investigation and the withholding of his bonus during the pendency of the investigation likewise fails for two reasons.

Jordan asserts that the decision by FAMS' management to delay notifying him that he was the subject of an internal harassment investigation and to withhold payment of his bonus during the pendency of the investigation was made because of his race and/or in retaliation for his complaints of discrimination. Defendant asserts that Jordan's claims related to this issue fails for two reasons, and the Court agrees.

First, Jordan has failed to present sufficient evidence to allow a reasonable jury to find that FAMS' failure to promptly notify him that he was under investigation and to withhold payment of his bonus during the investigation was an adverse employment action. To begin, Jordan presents no evidence that the purported delay in notifying him that he was under

---

[7] Defendant also asserts that the denial of the opportunity to serve as an Acting SAC is not an adverse employment action for the purposes of Title VII. However, it is undisputed on this record that serving as an Acting SAC furthers one's career path and promotional opportunities within FAMS, (PSOF Resp. ¶64), and courts have reached differing results as to whether the denial of such an opportunity constitutes an adverse employment action. *Compare Martin v. D.C.*, 78 F.Supp.3d 279, 305–07 (D.D.C. 2015) (denying summary judgment after finding that denial of the opportunity to serve as relief supervisory investigator was an adverse employment action) *with Zaffuto v. City of Hammond*, 308 F.3d 485, 493 n.8 (5th Cir. 2002) (denial of opportunity to serve as acting shift lieutenant while supervisor was on vacation was far too minor to constitute an ultimate employment action). Even assuming arguendo that the denial of such an opportunity would constitute an adverse employment action, Jordan nonetheless fails to present sufficient evidence to establish a prima facie case on this claim for the two reasons outlined above.

investigation caused him to experience any harm whatsoever, let alone an economic injury or change in his employment status.

Furthermore, although a discriminatory act that caused the loss of a bonus would typically qualify as an adverse employment action (*see, e.g., Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)), an act that caused the delay in the payment of a bonus that was fully paid before the lawsuit is filed does *not* qualify as an adverse employment action. *Id.* ("We agree with the four other circuits to have addressed the question: An employer may cure an adverse employment action – at least one [concerning the failure to pay a proper bonus] – before that action is the subject of litigation."); *Id.*, at 1294 (affirming the grant of summary judgment because "there was no unremedied adverse employment action when the suit was filed" since the employer corrected its error and paid plaintiff her full bonus). This same conclusion holds even for retaliation claims, where a more expansive definition of adverse employment action applies. *See, e.g., Lewis*, 909 F.3d at 868 (a "delayed paycheck" and a "short paycheck" were "simply isolated administrative errors that were resolved . . . [and] did not cause Lewis lasting harm or injury sufficient to dissuade a reasonable employee from engaging in protected activity."); *Reid v. Buttigieg*, No. CV 20-1262 (TJK), 2023 WL 2184549, at *8 (D.D.C. Feb. 23, 2023) (citing *Taylor* and finding that it would undermine Congress's policy of encouraging informal resolution during the exhaustion period to allow plaintiff to assert a retaliation claim based upon wrongfully withheld back pay and benefits that were fully reimbursed prior to the filing of plaintiff's lawsuit).

Second, Jordan has failed to provide evidence that a similarly situated person who is a non-African American and/or who did not complain of discrimination was treated more favorably than him by defendant. As the Seventh Circuit has explained, "[a]ll things being

equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination. The 'similarly situated' prong establishes whether all things are in fact equal." *Coleman*, 667 F.3d at 846 (cleaned up). "In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.*, at 847 (cleaned up). Although whether a comparator is similarly situated is usually a question of fact, summary judgment is appropriate "when no reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Id.*, at 846–47 (cleaned up).

Here, Jordan compares himself only to Kohl, who received prompt notice that he was under investigation and timely payment of his bonus during the pendency of his investigation. Dckt. #50 at 15-17. However, it is undisputed that Kohl (as the Chicago SAC) was Jordan's supervisor. The Seventh Circuit has repeatedly held that "ordinarily, it will not be the case that a plaintiff is similarly situated to another employee when the plaintiff is subordinate to that employee." *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006); *Poullard*, 829 F.3d at 855 ("Mailand was Poullard's supervisor, for one thing. This fact alone makes it difficult to conclude that two employees are similarly situated."). Jordan cites no authority to the contrary,[8] or any facts to indicate that this is anything but an "ordinary" case where a plaintiff has unpersuasively attempted to compare himself to his supervisor. Consequently, this Court finds that summary judgment on claims related to the delayed notification and bonus payment is

---

[8] *See Meka v. Dayco Prod. LLC*, No. 2:23-CV-11437, 2024 WL 3556180, at *3 n.2 (E.D.Mich. July 26, 2024) ("Meka fails to identify any case in which a court found that a plaintiff's supervisor is similarly situated for purposes of a Title VII claim. Indeed, McGahey, Meka's supervisor, holds a different position and has a different supervisor.").

appropriate for this reason as well. *Id.*; *also Reives*, 29 F.4th at 893 (plaintiff "has not shown that [the proffered comparator] was similarly situated to him, so he cannot establish a *prima facie* case of race discrimination under the *McDonnell Douglas* approach.").

### 3. Jordan has Failed to Raise a Genuine Issue of Fact as to Whether He Experienced a Hostile Work Environment Based on Racial or Retaliatory Animus.

Finally, Jordan asserts that his supervisor Kohl and his subordinate Vickerman created a hostile work environment on the basis of his race and/or in retaliation for his complaints of discrimination. Title VII is violated "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create a hostile working environment." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (cleaned up). Thus, to overcome defendant's motion for summary judgment, Jordan must present evidence demonstrating: "(1) [his] work environment was objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Rongere v. City of Rockford*, 99 F.4th 1095, 1105 (7th Cir. 2024) (cleaned up). "Deciding whether a work environment is hostile requires consideration of factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Id.* (cleaned up). Finally, "[t]o qualify as severe or pervasive under the third prong, the conduct must be 'extreme' considering all the circumstances." *Id.*; *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 600 (7th Cir. 2021) (same).

Defendant asserts that it is entitled to summary judgment on Jordan's hostile environment claim because his environment was not objectively and subjectively offensive; the conduct at

issue was not severe or pervasive; and because Jordan has no evidence indicating that any of the actions in question were taken against him based on his race or prior protected activity. Dckt. #44 at 26–28. In the one paragraph of his fifteen-page response brief that he devotes to his hostile environment claim, Jordan relies on the evidence that Kohl called him the N-word in the Fall of 2018, makes vague references to "alleged petty slights" and "a false claim against hi[s] professional and personal reputation," asserts that other FAMS employees were fearful of retaliation, and that Kohl and Vickerman had a close relationship, yet Jordan cites no legal authority to rebut defendant's argument. Dckt. #50 at 18–19. Jordan's response is so superficial that it comes perilously close to waiver/abandonment.[9] Nonetheless, even giving Jordan the benefit of all doubt, his hostile environment claim fails for the following reasons.

To begin, Jordan has failed to offer sufficient evidence to create a genuine dispute as to whether the conduct of which he complains was "objectively" offensive or sufficiently "severe" or "pervasive" to constitute a hostile work environment.[10] Viewing the evidence in the light most favorable to Jordan, he complains of: (a) Kohl undermining his authority by communicating directly with Vickerman (who was under Jordan's supervision); (b) Kohl and Vickerman making fun of Jordan and his work; (c) Kohl omitting Jordan from emails and meetings that Jordan believed he should have been privy to; (d) Kohl cutting off Jordan in meetings and ignoring issues that Jordan raised; and (e) disparaging his reputation by investigating him for a complaint of harassment of which he was ultimately cleared without promptly notifying him of the existence of the investigation. *Supra*, at Section II.

---

[9] *See, e.g., United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017) ("We have repeatedly and consistently held that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (cleaned up).

[10] The Court presumes for purposes of summary judgment that Jordan found his work environment to be *subjectively* offensive.

Such conduct, even considered as a whole, is not sufficient to enable Jordan to avoid summary judgment. In *Hambrick v. Kijakazi*, for example, the Seventh Circuit affirmed a grant of summary judgment in defendant's favor on plaintiff's hostile environment claim despite plaintiff's evidence that she was subjected to "harassing emails," a "lack of recognition," "everyday work disagreements," "being left off the staff directory for a few months," along with a "heavy workload, management's high expectations, and routine workplace discipline (such as weekly touch point meetings and a discipline meeting for tardiness)." 79 F.4th at 842–43 (7th Cir. 2023). In doing so, the Court noted that "having supervisors who are short tempered, hostile, unfairly critical, and disrespectful, does not amount to objectively offensive, severe, or pervasive conduct." *Id.*, at 843 (cleaned up); *Abrego v. Wilkie*, 907 F.3d 1004, 1015 (7th Cir. 2018) (same, and noting that being "subjected to excessive monitoring" by a supervisor is not "objectively offensive" conduct); *Bell v. E.P.A.*, 232 F.3d 546, 554–55 (7th Cir. 2000) ("demeaning assignments, verbal abuse, surveillance, diminished responsibilities, refusal to cooperate on job assignments, and placements in situations designed to result in failure" even in the aggregate, "do not rise to the level of actionable retaliation"); *see also Sherman v. ConAgra Foods Inc.*, No. 21-CV-1038-SCD, 2024 WL 3594646, at *9–10 (E.D.Wis. July 31, 2024) (citing *Hambrick* and *Abrego*).

Lastly, Jordan relies on the evidence that Kohl referred to Jordan as the N-word in the Fall of 2018 – which this Court presumes true for purposes of summary judgment. There is no question that Kohl's reference to Jordan as the N-word was despicable and inexcusable within FAMS or any other workplace. "This is because the word n[**]ger is pure anathema to African-Americans . . . [and] [n]o other word in the English language so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against

African-Americans." *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 815 (7th Cir. 2022) (cleaned up); *Scaife v. United States Dept. of Veterans Affairs*, 49 F.4th 1109, 1116 (7th Cir. 2022) ("It goes without saying that the N-word is an egregious racial epithet."). Indeed, "[a] one-time use of the epithet can in some circumstances warrant Title VII liability. *Scaife*, 49 F.4th at 1116 (citing *Paschall*, 28 F.4th at 815).

Nonetheless, Kohl's reference to Jordan as the N-word does not save Jordan's otherwise deficient hostile environment claim under the circumstances here. It is undisputed that Jordan (who left FAMS in 2018) did not learn of Kohl's use of the N-word until July 2021. Since Jordan did not know of Kohl's use of this racial slur while he was working at FAMS, the slur had no bearing on whether Jordan's work environment at FAMS was "objectively and subjectively offensive" or whether the conduct he was subject to while at FAMS was "severe or pervasive." Even Jordan acknowledges this. Dckt. #50 at 12 ("The racial epithet may not rise to a level of hostile work environment."). Moreover, even if Kohl's use of this racial slur could serve to suffuse each of Kohl's actions with racial bias (as Jordan contends, Dckt. #50 at 12), Kohl's actions were not sufficiently "severe or pervasive" or "objectively offensive" to constitute a hostile work environment regardless of what motivated him to engage in those actions.[11] Put another way, suffusing Kohl's actions with racial bias (thereby satisfying the second element of a hostile environment claim) does not alone make his actions sufficiently objectively offensive or severe or pervasive to satisfy the first and third elements of a hostile environment claim. *See Rongere*, 99 F.4th at 1105 (listing elements).

---

[11] The Court further notes that Jordan offers no evidence to suggest that Kohl's actions were motivated by retaliation or that Kohl had any role in prompting Vickerman to complain that Jordan had engaged in harassment.

Consequently, Jordan has failed to produce sufficient evidence to allow a reasonable jury to find that he was subjected to a hostile work environment in violation of Title VII based on racial and/or retaliatory bias.  Accordingly, defendant is entitled to summary judgment on Jordan's hostile work environment claim as well.

## CONCLUSION

For the above reasons, defendant's motion for summary judgment, Dckt. #42, is granted.

**Date: November 4, 2024**

**Jeffrey I. Cummings**
**United States District Court Judge**